1-5-3-6-1-4 Friends to elect Colleen M. O'Toole v. Maureen O'Connor, Chief Justice, Ohio Supreme Court, et al. Arguments not to exceed 15 minutes per side. Mr. Hartman for appellant. Good afternoon, Your Honor. Kurt Hartman on behalf of the appellant, Friends to elect Colleen M. O'Toole, I would like to reserve four minutes for rebuttal. You may. In McCutcheon the Supreme Court admonished that, quote, those who govern should be the last people to help decide who should govern. Those who govern should be the last people to help decide who should govern. Yet in adopting the Ohio Code of Judicial Conduct, the Ohio Supreme Court has taken the lead in helping decide who to govern through regulating campaign speech, core political speech protected by the First Amendment. But the Supreme Court has not gone just so far in their lead of trying to regulate judges and judicial candidates. They've extended their efforts to try to decide who should govern by regulating the core political speech of private citizens, private citizens who come together to support a judicial candidate in the form of a campaign committee. And that is the heart of what is before the court today, the desire and effort of private citizens, organized as a political campaign committee, to fully and actively participate in the marketplace of ideas through the course of a political campaign, and not being stifled and kept out of that marketplace of ideas until 30 days before the petition filing deadline. Counsel, before you get deeply into, I guess, your and decide this case, what's our governing standard? Is it de novo? Is it a mix? What is it? It generally is a mix. I mean, we are here on the appeal from a denial of a preliminary injunction, and generally that is subject to an abuse of discretion review. However, because this does implicate the First Amendment, where the first standard, the substantial likelihood of success, is often the determinative factor, and that question is a legal question, that question is subject to de novo review. The court in Platt did clarify that the ultimate determination of whether or not to issue a preliminary injunction is abuse of discretion. However, if you look at the standard as to what constitutes an abuse of discretion, improperly applying governing law or erroneously applying the legal standard, this court in its en banc general decision said that would be appropriate to reverse the preliminary injunction. And in this case, we believe we set forth clearly where the district court did abuse its discretion It puts the burden upon the plaintiffs to demonstrate the unconstitutionality. That's not the law. The law requires that when government regulation burdens speech, the burden is upon the government. That's the Playboy Entertainment Group decision. The court also put the burden on us, saying this was an overbroad challenge. This is not an overbroad challenge. It is a content-based restriction. And so therefore, this no set of circumstances criteria doesn't even apply in this case. But the district court imposed that on us. The district court imposed this theory, this really unique theory of alter ego, that a judicial campaign committee is the alter ego of the candidate. And therefore, if I can regulate the candidate, we can regulate the judicial campaign committee. The district court also erred, I think, in really holding the government to no evidentiary burden whatsoever. And if you look at the evidence in the record, and that's where I would like to go into the evidence in the record. The evidence, we put forth the evidence in the record. And I think the most compelling evidence is, it's document four, it starts at page 121 of the district court's record, where the treasurer of the campaign committee declares that because of this prohibition against soliciting or accepting contributions, the campaign committee is going to be relatively inactive, unable to engage in its principal purpose of advocating the election of Judge O'Toole. So there, the speech would be the solicitation of contributions? Or do you argue that the receipt of contributions is speech? The direct receipt of contribution is not speech, but it does tie in together. We cite it on, I believe, a page... Solicitation is... Tied together. I think at page 49 to 51 of our principal brief, we talk about cases where the Supreme Court even has recognized that contributions and converting contributions into expenditures is a form of speech. We cite the Texans Free Enterprise case out of the Fifth Circuit, where they say there is no difference in principle between banning an organization from engaging in advocacy and banning it from seeking funds to engage in that advocacy. But in this case, the ban is on solicitation itself. That is, the committee can't say we'd like you to contribute, whether or not anybody contributes a dime. It cannot ask that, and even if it could ask it, it can't accept it. It's a ban on solicitation and a ban on accepting. And even in Buckley-Vallejo, the court recognized that there is a separate question. Buckley dealt with the rights of a potential contributor. That's not what we have here. We have in what Buckley characterized as converting contributions into expenditures into speech. When you were talking about private citizens, am I right, you're focusing only on the committee, that is, the private citizen who might want to contribute. I mean, in a sense, that's speech also, but he can send a check. It's just that they can't take it. Correct. So focusing on the committee. The committee, but there's two private citizens in that gist. One is the private citizen who wishes to be a potential contributor. The second is the private citizens who are formed and organized as the campaign committee, as the appellant before this court. But it sounds like it's really the first one that's your major focus. No, both. Both and really the second for the most part, because the campaign committee, that's just before this court, and it's the campaign committee that wants to go out there. Ms. Goss' declaration clearly indicates we want to go out and buy t-shirts, I thought they could spend anything, but they can't get the money to do the spending. And therefore it is a direct impact on expenditures. The circuit's recognized it. Depending on whether they have gotten money from before, because I take it your client only had $99 left over, but there was nothing illegal about her having gotten more in the past. That's correct. But consider the scenario, this isn't the facts, but what if I'm not even a sitting judge and I want to run against one of these people? But here, we had some discussion in the papers about whether this is a facial or as an applied challenge. Are you trying to raise the rights of non-incumbents as well? Absolutely. I believe this law is facially unconstitutional. And I think if you look at the Citizens United case, the Supreme Court there does talk about the distinction between facial and as applied challenges. And it recognizes that really goes more towards the remedy than in terms of the assessment. But here, because it is a content-based restriction, I don't want to get bogged down, but in this facial versus applied, but if you're dealing with third parties, you're talking in over-breath, this is an over-broad law, that's not the challenge. The challenge here is that this is a content-based restriction on speech subject to strict scrutiny. They cannot and have not satisfied the requirements under strict scrutiny to constitutionally justify this law. Therefore, the law is facially unconstitutional. That's the issue. It's not over-broad. It's not a no-set-of-circumstances case. Because if you look at what we do, I mean, again, we do a First Amendment and the Equal Protection Claim. And they're really separate issues. And really, the sine qua non for the whole First Amendment claim for the state of Ohio is this whole alter ego theory that they call upon, that they developed. And it's interesting, you know, alter ego, I mean, it's almost a sine qua non. You have to accept the alter ego argument that they offer in order to uphold this law. I don't think it absolutely determines that. But if you reject this alter ego theory, the state of Ohio loses on this challenge. Now, what do you mean by alter ego? That Williams-Uly says you can keep the candidate from soliciting, therefore the committee can be kept from soliciting? There is a difference and a distinction between the candidate and the campaign committee. Williams-Uly clearly and repeatedly recognized that distinction. Williams-Uly talks about drawing a line between personal solicitation by candidates and solicitation by committees is necessary to preserve public confidence in the integrity of the judiciary. But Ohio does that, right? No, Ohio... No, I mean, the Ohio statute does not allow judges to solicit in the same way that Williams-Uly doesn't allow them to solicit in Florida. Correct. Correct. And the Ohio rules themselves actually recognize a distinction between the judicial candidate and the campaign committee. Basically, contributions must be directed to the campaign committee and not to the judicial candidate. That's rules 4.4, 8.2, and 8.3. The comment to rule 4.4 talks about the establishment of a campaign committee to solicit and accept contributions, manage the expenditures of campaign funds, and generally conduct the campaign. The rules themselves recognize this distinction. But the district court developed this, at the urging of the government, this alter ego theory that, well, the campaign committee is nothing more than the alter ego of the judicial candidate. Therefore, they're one and the same. Therefore, if I can regulate the judicial candidate, it's no different than... If that were true, Williams-Uly would say you could prevent there being any contributions to anybody. Absolutely. It undermines that. Their argument on alter ego undermines that prohibition against personal solicitation against the judicial candidates. Because if they are one and the same, then why are you allowing a campaign committee to personally solicit if that is the judicial candidate? It doesn't make sense. Plus, alter ego, the whole alter ego theory, no case, and they cannot cite a single case, that has upheld the regulation and infringement of constitutional rights based on alter ego theory. I know this is a facial challenge, as you said, that the 4E prohibits this soliciting funds basically four months before the election and four months, or 120 days before and 120 days after. So is it your contention that there should not be any restrictions? I know you said restriction of content, but there shouldn't be any time restrictions on the ability to solicit campaign contributions and that any period that the court came up with would probably also be unconstitutional. If I may, I might. Please. That's beyond the issue, that's before the court today. But, yeah, I do not believe, when we're regulating the speech of campaign committees, that's the barrier that separates the judge from the campaign as the campaign committee. That's that buffer that protects the judge from that political activity that's what we're trying to do in order to maintain integrity. If we adopt counsel's position that the committee is simply the alter ego of the committee, then that's, I know you don't accept that. No case law supports that theory. Okay, counsel, you'll have your four minutes for rebuttal. Great. Well, let me just ask you, I mean, the Chief Justice's plurality, I guess in the Williams-Yali case, says that the, we'll strike that. If we don't focus on the alter ego theory, of the candidate and the campaign committee, there still is a governmental interest in limiting contributions to a time close to the election to avoid the appearance of impropriety. And because Chief Justice talked about judges being different from other politicians, and that being the case, seemingly there might be a compelling interest, a governmental interest in avoiding that appearance of impropriety in the process of electing judges. So that point would sort of weigh against your argument, would it not? I just, with all due respect, I do disagree. Firstly, Williams-Yali dealt solely with the judicial candidate itself, not the campaign committee. It recognized that distinction. The, where else I wanted to go with that? I'll also, so I think that's the first thing to recognize, is that distinction there. The second thing, in terms of compelling interest, the strict scrutiny of two tests, compelling interest, narrowly tailored, but that compelling interest also has two elements. Is it a compelling interest in the abstract? And we agree that public confidence in the integrity of the judiciary is a compelling interest in the abstract, but there's a second half to that compelling interest test, and that is, does the rule or regulation at issue actually advance and is it addressing that compelling interest? And that's, they don't put forth any evidence on that, and that's where I think they fall down in terms of this regulation, in terms of going after campaign committees. How does regulating the speech of a campaign committee promote public integrity in the judiciary? There's no evidence in the record, they basically offer ips and dixit, and what was intuitive, what the Chief Justice in Williams-Uley said was intuitive, was that second half of the compelling interest aspect. That having judges personally supplicate, was the verb he used, personally supplicate for contributions, undermines, that's what was intuitive, that was it. You know, and I, I'm sorry, go ahead, Judge. No, I'm all done. I was just going to say, though, going back to your argument about this being a restriction, 4.4E doesn't limit the, the amount of contributions that the committee on behalf of the candidate can receive, nor does it limit the amount that the candidate, or the committee on behalf of the candidate can spend, and I thought that it was the ability to spend to get the message out, that was really sort of the gravamen of this whole issue, when we're talking about money being speech in the context of elections. It does restrict the amount of money that can receive, it can receive zero dollars a day. No, within the time frames, it simply gives you a window, but within that window, how much you can raise. Well, and there are contribution limits and other provisions of the Ohio Code of Judicial Conduct, which restricts the amount of contributions, which I would submit as a more, less restrictive means of advancing that interest. That it's a $600 for the common pleas level, it's $1,300 as the contribution limit to the Ohio Supreme Court. So, but at the present time, the ability to raise any money, and that's what the Zeller case out of Florida recognized, that at the present time, it's not a contribution limit, it's a contribution prohibition. Okay, counsel, I think your time's expired, you'll have four minutes for rebuttal. Good afternoon, your honors. My name is Drew Campbell, on behalf of the Appalese, and I'm joined at council table by my colleague Corder Schimmel. Your honors, the issue we have today is whether the trial court erred when it decided not to enjoin Operation Rule 4.4E, which, as you know, simply requires that the solicitation and receipt of campaign contributions occur in proximity to the election cycle. The court considered free speech claims, considered the equal protection claim, and concluded that because this rule simply rearranges the time frame within which this activity can take place, that the committee had failed to show it was likely to prevail on the merits at this particular point in time. Now, Rule 4.4E does not operate in a vacuum. To your question, Judge Donald, it tells us at the front end that, first of all, it permits a lot of solicitation activity. Under Subpart H, next Tuesday, Judge O'Toole can contribute to her own committee. On November 9th, the committee can solicit to the public at large for an election campaign that takes place one year later. The general election is one year later. 120 days before the primary. Correct. In some circumstances it would be 10 months. But they also have 120 days after the general election to continue to solicit and raise money on behalf of that candidate. The point is... Again, that has nothing... That doesn't help you win the election. You've either lost the election already or you've won the election already. Your Honor, the point is that the rule allows ample time for all candidates to solicit and raise money for their campaign. Your brief at page 9 has this very nice, elegant chart, which I did appreciate, and it says well, there's lots of stuff. The committee can receive contributions for 19 months, but of course that's not 19 months before the crucial race. But am I right? It does mean that if you have had a previous race, you can have raised money for 19 months then, including after you've already won, right? That is correct. So that any incumbent and especially the four-sided incumbent who may want to run again quite soon for some office can load up a war chest without apparently creating an appearance of impropriety. In fact, what many judges are doing is raising money for use for certain activities they conduct as a judicial officer that would otherwise come out of their personal pocket. Things like attending various functions that judges attend throughout the state of Ohio. Then how does that structure contribute to no appearance of impropriety when judges can be doing all of that, whereas the person who's fresh out of the gate, whether a non-incumbent or an incumbent who wasn't four-sided is barred from doing any such until 120 days before the primary? Well, I think that's the point. The point of this rule is that it permits ample opportunity for fundraising and the fact of the matter is that, unlike the Florida rule, which barred any solicitation by the candidate, Ohio has drawn their line a little differently. They permit the candidates to engage in The fact that the candidate can continue solicitation, this is very broad, right? You can make a general speech. I always thought this was pretty close to the Florida rule that you can't sit down with the guy or ask him, hey Joe, give me $1,000. Well, to be clear, in order to make the ask, you have to be in a group of 20 or more, or you can sign letters or send out electronic messages. Nothing in the rule is going to say, your honor, how can I contribute to your campaign? Your answer could be, talk to my committee. Nothing bars that. The point is that the rule permits all kinds of activity directly connected to the solicitation of funds. Pardon me? Would that have been barred in Florida? Well, according to the Williams v. Lee decision, there was an absolute prohibition on solicitation. They didn't address that particular issue. Simply making the point, even as important as a solicitation, Judge Dunlop, back to your question, is what the rule doesn't regulate. It doesn't regulate expenditures. They're free to go out and raise volunteers. They're free to circulate petitions. They're free to seek party endorsements. There's the broadest spectrum of First Amendment activity that the committees can engage in. This rule regulates the narrowest slice of activity. When the candidate and the committee can ask for money. That's all it does. Tell me a bit about your alter ego theory and why the committee, in your estimation, is the alter ego of Judge O'Toole? Well, actually it's not my theory. We start with Rule 4.4A, which says that the candidate is responsible for the conduct and the misconduct of the committee. The Ohio Revised Code says that the committee is going to be responsible for the debts that it incurs on behalf of the candidate. So what we have here is not a theory invented by the trial court. What we have is a thoughtful, comprehensive scheme in Ohio, both by judicial rule and by the Ohio Revised Code that says that when it comes to raising money and when it comes to being responsible for the conduct of the committee, the two are virtually one and the same. And what the trial court said was the two are really tethered together as a virtual alter ego. And what we're really saying here is that they're two sides of the same coin. Now, the compelling interest that the Supreme Court identified here is not merely compelling interest. They said it was an interest of the highest order. And the hierarchy of compelling interest that our Supreme Court has identified, protecting the public perception of the integrity of the judiciary, comes in first place. It's the highest order. And that, for the reason we just discussed, applies to the committee. With the same force, it applies to the candidate. The point is that... ...doesn't Williams-Uly say that you can prevent any receipt of contributions if they're the alter ego? And if Williams-Uly says the candidate can't solicit or receive, then it would mean that in Ohio no one could solicit or receive contributions. Well, actually, I think it's a little bit different. I think the Supreme Court recognized...Justice Roberts was really careful to say that all these rules strike a compromise. We have a perfect world where we're concerned about the absolute integrity of our judiciary. We have a political world where somebody's got to go out and make the ask. And so the Court recognized that all these rules are striking a balance. They're looking for a compromise position where someone is empowered to go out and make a more direct solicitation than the candidate. Now, Ohio... When we talk about alter egos, you usually mean they are one and the same. Well, let's not get hung up on alter ego, Your Honor, because that was a characterization of the way the statute works and the rule works. And in fact, what's happened here is that Ohio has drawn its line a little differently than Florida did, and more generously. Ohio says the candidate can solicit. Florida said they can't. But Ohio has also said that because there's such an identity of interest between these two entities, it only makes sense that they'd be subject to similar restrictions. If the rule were that the committee that, well, strike that, it makes sense that the similar parties would be regulated in similar ways for purposes of imposing this temporal limitation. Now, let's be clear about what's happening here. Temporal limitations, time and again, have been identified by courts as reasonable and constitutionally appropriate ways to advance the state interest. Here, the interest has to do with looking at the independence of our judiciary. This court, in the Gable case, found that a 28-day prohibition right before the election was acceptable within the context of Kentucky's campaign finance rules. The Thalheimer case in the Ninth Circuit... asking, raising, and soliciting money 28 days immediately prior to the election in Kentucky. Thalheimer... It was the opposite. It was different. He was trying to keep it away from election day. He was trying to put it close to election day. Well, I'll finish my thought. The Thalheimer court, on the other hand, in the Ninth Circuit upheld a San Diego rule that said that fundraising had to occur in the 12-month window before the election. The point was that in each of these cases, the limitations that are acceptable when it comes to advancing compelling interest. Now, what's different about those cases is that those are political cases. Williams-Yu Lee has completely rewritten the context for our analysis. Williams-Yu Lee has said, quite clearly, that judicial elections are different. Judges are not politicians, and that states may regulate differently. When they say that states may regulate differently, they're saying that in this unique arena, new set of rules, states have a little more authority, and they are entitled to more deference in the choices that they make. In fact, to the Ohio rule, what Williams-Yu Lee spoke to us was this, that the considered judgments deserve our respect, especially because they reflect the sensitive choices by states in an area central to their own governance, how they choose the ones who judge them. And so what Williams-Yu Lee is telling us is that our area of judicial elections is different because these races are different and our candidates are different. So Ohio has given more breadth to the candidate, but at the same token, they've also recognized that because they are operating in a very similar realm with the committee, they ought to be regulated in similar ways, and that's exactly what's happening here. Now, with respect to the narrow tailoring of this rule, back to Judge, your point, we've already talked about all the things the rule doesn't regulate, and the one thing it does, and the trial court found that that constituted narrow tailoring for purpose of advancing this highest interest that the state has in terms of managing and maintaining the integrity of their own judiciary. With respect to narrow tailoring, and maybe I'm beating this, but the part that at least causes me the trouble is the carryover from the previous election. In the distant past, I was involved in some elections, and it's a lot easier to raise money once you've already won, and Ohio allows a sitting judge to continue to raise money after he's already won, sock it away, and wait for the next race, whereas somebody else who wants to run against them is limited to that 120 days before the election. Isn't that the truth? Well, it's an accurate statement of how the rule operates, but let me suggest to you that the issue that is before us right now, to your point, is the complaint that there's a differential in retained funds for some committees. In this case, it's $254,000 against $99. And so here's the problem with that argument. First of all, this rule applies the same way to everybody. Everybody plays by the same rule. The fact that some committees may retain more money than others has nothing to do with the rule. It has everything to do with the choices made by these committees. Perhaps there was a committee that had a candidate with a great message, easier to raise money. Or perhaps the committee was better at raising money, or maybe they were participating in a campaign that wasn't contested, or they were simply wiser about how they spent the money. Whatever the reason, the fact that some committees retain more than others has everything to do with how that committee operated as compared to another. And that was exactly why the trial court rejected that argument on equal protection grounds. I would suggest to you that the complaint here is akin to my kid complaining that they got an F on the test, but they never studied. Some committees are better than others. Narrow tailoring is narrowly tailored to the interest involved. And the interest involved here is sort of appearance of impropriety, I take it? Correct. And the things that you've said don't seem to go to why there is more appearance of impropriety for Ms. O'Toole to raise money today than it is for whoever the other candidates are to have raised a ton of money after they were already elected to the previous office. Well, respectfully, Your Honor, here's how I think it advances this. Ohio has made a compromise in terms of how it is that judicial candidates get to raise money. And they've said, we don't want candidates raising money every day of the week like they're an ATM. What they're saying is we're going to draw these lines around timing, some time periods before, some time periods after, and we're going to cut it off. And outside of those time frames, we don't want our judicial campaigns to look like every other political campaign. So the temporal limitation directly advances Ohio's interest by simply caboting that activity within those time frames. And, of course, they've tried to be generous in those time frames so the candidates have the ability to go out and raise what they need and engage in that kind of speech. So to your point, I think the fact that they have a start and a finish is a line that Ohio is permitted to draw. Now, just as Robert said in Williams U. Lee, that the kinds of questions you're raising are the kinds of questions that are maybe where the courts have to be more solicitous. He said he wasn't going to wade into that kind of line drawing precisely because states have flexibility in how it is they're going to advance the interest that they have. And Ohio has simply chosen to draw the lines in a time period before and a time period after. And outside of that, we don't want our candidates and our committees raising more money for judicial elections. So that's how these temporal limitations strike the balance between core speech and advancing our interest in independence and integrity. I suppose, the same I'm concerned with the previous raising the question is, is that piling up, permitting it still enough to be narrow tailoring? I suppose you could require them to contribute back the money at the end of a successful race and not pile it up. Well, you might draw the line differently. Now, one of the things the trial court pointed out was that the ability to continue that raising of funds really comes from an ethics opinion, which the trial court pointed out isn't really challenged in this complaint. But I think, you know, to your point... The statute wouldn't have put in, I mean, the rule wouldn't have put any limitation either. The ethics complaint, the ethics ruling as I read it, just said, yeah, you can do what the letter of the law seems to allow you to do. That's the way I read it, too. And I think at the end of the day Ohio, as I said, has chosen to draw the line this way so that candidates have ample opportunity to raise money within the restrictions of these time periods. And so I think that the lesson that we receive from the Williams U. D. Court is that this is a very different paradigm than we had before. These elections are different, states may regulate differently, and the courts are asked to be solicitous to those choices. Here, choosing temporal limitations has always been recognized as a constitutionally acceptable way to advance the kind of interest that we have. Thank you. Any other questions? Thank you, Counsel. Thanks, Your Honors. We appreciate it. Four minutes for rebuttal. May it please the Court. I want to go right to your issue, Judge Boggs, about if a candidate is successful in a prior race, can they continue raising money afterward? Absolutely, and it's been done. This Court can take judicial notice of the Ohio Secretary of State's website campaign finance reports, and Judge DeWine, the candidate in this race with $250,000 had a campaign fundraiser three months after he last won the election. So yes, it does happen, it can happen, and that's how you build a war chest. There are other races out there where people have been unopposed in the primary, unopposed in the general election, yet they build up a war chest. They're campaign committees. One thing I want to point out, Mr. Campbell pointed out, next week Judge Appool can contribute to her own campaign. Of course, that makes the carry decision. Judge Sutton of this Court recognized what these type of rules do. They benefit the incumbent over the non-incumbent because they benefit the position of their office. They benefit the well-connected, who has this array of fundraisers, and they benefit the well-to-do, those who can self-afford their own campaign. Not everybody is a Donald Trump and is going to be able to finance their own campaign. And it's somewhat anti-democratic, if you think about it, that we only want people who can financially afford to run for office to run for office. That's repugnant to what our the 120 days after the election. And this really shows that they really are not regulating these times relative to the public perception of integrity. If my candidate loses an election and so is no longer running for judge, the rules still say you cannot raise any more money after 120 days. If my candidate dies, you cannot raise money until only 120 days after the candidate dies. How does that, and that shows that these rules regulating before and on the tail end have nothing to do with the public perception of the judiciary. It's interesting also, we talk about the Williams-Julian-Florida case. In 1995, this exact provision was struck down in Florida as being unconstitutional. So for 20 years, Florida has operated without this time restriction. And you would have thought that if in that 20 years that the lack of this 120 day restriction, in Florida it was a one year before the election restriction, but the lack of that had created such problems with the public perception that the state of Ohio would have evidence to show here's what happened in Florida. So we have a situation where this rule was in place, it was struck down, and for 20 years nothing's gone on. Struck down by state or federal court? U.S. District Court, it was not appealed. That's the Zeller case that we cite in our brief. And it's interesting, in their brief they say, but for this 120 day restriction the prohibition against personal solicitation may be under-inclusive. Well the Supreme Court in Williams-Julian said that it was not under-inclusive and that was a situation where this 120 day rule did not exist. You talked about the anti-democratic nature of the situation, the way this rule operates. But if you had the ability to raise money earlier, that's not going to change the relative advantage between the haves and the have nots. It's a question of who's controlling the marketplace of ideas. In 2014, there were 1.3 million voters in the state of Ohio in the Republican primary. That's Secretary of State's website's results. 1.3 million voters. How do you communicate, how do you communicate that 1.3 million voters, and the pool of potential voters is larger even in the Republican primary. If you go out and you're soliciting to potential donors and you are not successful because of your message, because of your candidate, that is the marketplace of ideas working. That's the appropriate work in the marketplace of ideas. Federal courts should not be involved. Mr. Campbell says that you have to look at the way the rule operates, and here the rule operates the same for everybody. And the point I'm making is if you've got a candidate using your words, who doesn't have a good message, who's not a good campaigner, and let's say they can start raising money nine months before, you've got somebody else over there with a bunch of money and a better message, they're just going to be able to out-raise them by nine times. That's why I go back and I say I think that you've got a problem in terms of the procedure you're traveling on. If my message does not sell, if my candidate does not sell and contributors will not contribute, that's the marketplace of ideas and there should be no role for the federal court. But that's not this case. This case we've got the government coming in, dictating, manipulating, and controlling the marketplace of ideas. I want the marketplace of ideas to determine how much money a candidate can raise, not the government. That's the difference. Who controls the marketplace of ideas? Does the marketplace control itself or do you allow the government to say you've only got this 120-day window to be out in that marketplace of ideas? Thank you, counsel. Case will be submitted.